FILED
2014 Oct-22  AM 10:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| FRED MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| POOL CORPORATION and | ) | |
| SUPERIOR POOL PRODUCTS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

COMES NOW Plaintiff Fred Moore ("Plaintiff" or "Moore"), by and through his counsel of record, and files this Complaint against Defendants Superior Pool Products, LLC and Pool Corporation ("PoolCorp"). As grounds for this Complaint, Plaintiff states as follows:

## I.     JURISDICTION AND VENUE

1.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331; this action is authorized and instituted pursuant to 42 U.S.C. § 1981.

2.     Venue lies with this Court pursuant to 28 U.S.C. § 1391(b) as the acts giving rise to the claims alleged herein occurred within this District.

## II.     PARTIES

3.     Plaintiff, Fred Moore, is an African-American citizen of the United States and is a resident of Huntsville, Alabama in Madison County, Alabama.

Plaintiff Moore served as Branch Manager of the Superior Pool Products facility in Huntsville, Alabama.  At all times relevant herein, Plaintiff resided in the district where this lawsuit is brought.

4.     Pool Corporation (PoolCorp), a Delaware Corporation, headquartered in Covington, Louisiana, is this country's largest distributor of products used for construction and maintenance of swimming pools.  Defendant PoolCorp sells products to pool builders, pool retail stores and pool service and repair companies throughout the United States.

5.     Superior Pool Products, LLC (Superior) is an Alabama limited liability corporation and wholly owned subsidiary of PoolCorp in the business of wholesale distribution of swimming pool supplies.

6.     The Defendants are corporations doing business in Alabama.

III.   FACTS

7.     Plaintiff hereby adopts and re-alleges paragraphs 1 through 6 above as if fully set forth herein.

8.     Plaintiff began work as Branch Manager for Superior in 2001 as a result of PoolCorp's purchase of a Hughes Supply, Inc. location in Huntsville, Alabama.  Plaintiff's beginning rate of pay was $60,000.00, plus other benefits and eligibility for an annual bonus.

9.    Plaintiff, through his efforts over thirty years for Superior, PoolCorp, and its predecessors, built the branch office of Defendants' wholesale pool sales and distribution business to a level of more than $6,000,000.00 in gross sales at the time of his termination.

10.    Plaintiff entered into an employment contract with Superior on January 17, 2003.  In the course of his employment, Plaintiff received raises and bonuses indicating that he was meeting or exceeding expectations during his employment.  His salary had been increased to $77,000.00, plus bonuses and other excellent benefits at the time of his termination.

11.    Between 2009 and September 3, 2014, Plaintiff was supervised by Regional Manager John Ferrer ("Ferrer") and District Manager Scotty Frantz ("Frantz").  Both Ferrer and Frantz are Caucasians.  In July, 2014, Plaintiff was told that Ferrer and Frantz would be moving to other jobs and that Mike Lilly would be taking over as Regional Manager.

12.    Plaintiff began work in the pool sales and distribution business in 1985 as a warehouse worker for Pioneer, a wholesale pool distribution company, in Huntsville, Alabama.  In 1991, Plaintiff was offered and accepted a position as Branch Manager for Calco, a wholesale pool distribution company, and worked at Calco until Calco was acquired by Cascade, another wholesale pool distribution company.  Thereafter, Cascade's Huntsville facility was acquired by Hughes

Supply, Inc.  In 2001, Hughes Supply was purchased by PoolCorp, which formed Superior in the same year.  At all times since 1991, Plaintiff was Branch Manager for the Huntsville branch offices of the aforementioned companies.

13.     Through his efforts and experience, Plaintiff substantially grew all of the above mentioned respective businesses after he became a Branch Manager. Plaintiff, individually and with members of his team, marketed the products and services to the customers.  Plaintiff courted and landed a majority of Superior's customers and Plaintiff maintained good relations with these customers throughout the years.

14.     Among Plaintiff's largest customers was Russellville Pool, owned by Stanley and Diane Hall of Russellville, Alabama.  The Halls became co-owners of Russellville Pool in the early 2000s.  Plaintiff's main contact with Russellville Pool became Stanley Hall.

15.     Stanley Hall was very difficult and short tempered under pressure; he cursed at the Plaintiff frequently.  On multiple occasions, Stanley Hall hurled racial epithets at the Plaintiff.

16.     Stanley Hall's racial insults to the Plaintiff began in the four to five year period prior to 2009.  The insults almost always involved Hall calling Plaintiff a "nigger."  Plaintiff reported most of these insults to Frantz.  Plaintiff would also

frequently ask Frantz to talk to Hall about stopping the insults, but Frantz found reasons not to speak to Hall about the racial harassment.

17.    In one of Plaintiff's telephone calls with Hall in 2009 or 2010, Hall, in a fit of rage over something Plaintiff told him he could not do stated:  "You better do it you goddamned nigger."   Plaintiff was deeply wounded by the statement. Following the call, Plaintiff called Scotty Frantz and told him about the insult. Frantz' only response was, "You can fire them but I won't take it off the budget." In effect, Frantz was telling Plaintiff that if he could not resolve the racial insults, it was his own problem and that the goals that had been set for him on gross sales would not change even if he "fired" his customer.   Neither Frantz nor Ferrer, whom he also told about the incident, did anything about the incident or investigated the incident or contacted the customer about this harassment.

18.    During the period between 2009 and September 3, 2014, the racial insults from Stanley Hall were delivered more frequently to Plaintiff than before. Thus, Plaintiff was forced to listen to these racial insults on the telephone, on telephone messages and in person.   The insults included the phrases "black nigger," "damn nigger," "goddamned nigger," and "you nigger piece of shit." Most of these comments were reported by Plaintiff to Ferrer or Frantz or both.  On many occasions commencing with the first time the racial insults were made to Plaintiff until mid-December, 2013, Plaintiff asked Ferrer and/or Frantz for help

with the racial harassment.  The Plaintiff told his supervisors that the comments were "tearing [him] up inside" and that he needed help from his supervisors.  On one occasion, Plaintiff played a telephone message from Hall for Ferrer that contained an insult using the word "nigger."   The only response that his supervisors made was that on several occasions they reiterated that Plaintiff could "fire the customer" but they always added the warning that it would be held against Plaintiff's budget.

19.    The comments by Stanley Hall were devastating to Plaintiff.  He was placed in the position of having to continue to endure the comments or face the prospect of seriously reducing his ability to provide for his family.  Plaintiff frequently confided to his wife, Sandra, about these racial insults and the torment they were causing him.

20.    In August or September, 2013, during a telephone conversation with Stanley Hall, Hall stated, "We need to go back to slavery."  When Plaintiff went home that evening, he again told his wife Sandra about what was said by Hall.  On this occasion, Sandra Moore told Plaintiff that on the next visit to Huntsville by Ferrer and Frantz, she was going to pay a personal visit to Plaintiff's supervisors and demand that something be done about the racial insults of Stanley Hall.

21.    As promised, in November, 2013, Sandra Moore went to the Huntsville Superior facility and talked to Ferrer and Frantz.  Upon arriving, Ms.

Moore was polite to her husband's supervisors but explained to them the emotional trauma that Hall's comments were causing her husband; she told them that the comments kept Plaintiff up at night and that they were affecting his health.  She requested that she be allowed to talk to Hall and so that she could make the demand for Hall to stop.  Frantz feigned a lack of knowledge and responded to Sandra Moore saying, "Is that stuff still going on?"  Ms. Moore told Ferrer and Frantz that she planned to confront Hall at the first opportunity.  The only response was by Frantz:  "It's fine."  Following the meeting, Ferrer and Frantz left the facility without further discussion with the Plaintiff.

22.    Thereafter, on a customer appreciation trip to Mexico between December 3, 2013, and December 10, 2013, Sandra Moore did indeed confront Stanley Hall.  Ms. Moore told Hall that the racial insults, comments and racial harassment of her husband had to stop.  Specifically, she told him that "When you say something like that to Fred [Moore] you say it about me and you say it about my son and my daughter."  Hall said very little but gave Sandra Moore the impression that he was going to stop making the comments.

23.    Following the discussion with Frantz and Ferrer about Hall and subsequent to the encounter between Sandra Moore and Stanley Hall, Plaintiff's treatment by his supervisors changed.  Instead of receiving direct communication and business calls from Ferrer and sometimes Frantz, most of the communication

7

stopped. Most of the important business calls that had gone to Plaintiff began going to Plaintiff's Business Development Representative (BDR), Phillip Works. The calls that Plaintiff made to Ferrer and Frantz were usually returned several days later or not at all.

24.     Plaintiff's normal duties included selection of and supervision of all personnel in the branch office.  When the position of Operations Manager became open, Plaintiff asked Ferrer if he should begin to work on filling the position. Ferrer's only response was, "I've got it covered."

25.     Except for a short cursory interview with Plaintiff, Ferrer and Frantz left Plaintiff out of the critical hiring decision for a new Operations Manager of the Huntsville branch.  When the new manager, Michael Thrash, arrived in Huntsville in early 2014, his salary had already been negotiated, his job duties were set by Ferrer and he went to work in Huntsville with very little interaction with the Plaintiff.  For the first few months after Thrash's hire (and the last few months of Plaintiff's employment) Thrash took his instructions almost exclusively from Ferrer.

26.     Following the incident with Stanley Hall, Ferrer and Frantz rarely sought Plaintiff's advice or took action on any of Plaintiff's recommendations.

27.     Phillip Works, a Caucasian, was hired in 2008 with no previous experience in the wholesale distribution of swimming pool supplies.  Works was

assigned to counter sales at Superior and in March, 2012, became Business Development Representative (BDR). The BDR is the lead sales person at PoolCorp branches.

28.   On or about May or June, 2014, Phillip Works gave notice to Regional Manager, Ferrer, that he was resigning his employment with Superior. On information and belief, Works had accepted a position at Pool Equipment and Supply (PES).  Before beginning employment with PES, PoolCorp offered Works and Works accepted the Plaintiff's position, Branch Manager for Superior in Huntsville.  In and around the same time, Ferrer and Frantz began building a paper case for terminating Plaintiff and replacing him with Works despite their knowledge of serious complaints about Works from customers.

29.   The case that was built by Ferrer and Frantz on Plaintiff was false and pretexual.  The case that was built involved alleged customer complaints that were never discussed with Plaintiff.

30.   Without previous warning or counseling, on September 3, 2014, Regional Manager John Ferrer and District Manager Scotty Frantz met with Plaintiff at his office in Huntsville, and told Plaintiff that they were "making a change in management" and "letting [Plaintiff] go."  When pressed for a reason by Plaintiff, he was told that the reason for the change was "customer complaints."

31.    Plaintiff was not made aware of any complaints by the aforementioned supervisors or others before he was terminated.

32.    Plaintiff, an African-American male with over thirty-three years in the business and with approximately twenty-three years of experience as a Branch Manager, was replaced by Works, a Caucasian male with approximately six years in the business, but with no experience as a Branch Manager or experience in the operations of the company and with numerous customer complaints related to his record at Superior.

## COUNT I

RACIAL DISCRIMINATION UNDER §1981

33.    Plaintiff adopts and realleges paragraphs 1-32 as if fully recited herein.

34.    This is a claim to redress the unlawful employment practice of racial discrimination prohibited by 42 U.S.C. § 1981.

35.    Plaintiff avers that his race is African-American; that he was qualified (in fact more qualified than his Caucasian replacement) for the position that he was terminated from; and that he was terminated from his position and replaced by a person outside of the protected class.

36.    As a proximate result of Defendants' unlawful intentional discrimination, Defendants have deprived Plaintiff of his right to make and enforce

employment contracts to the full and equal benefits of laws and regulations, thus affecting the security of Plaintiff's employment because of his race in violation of 42 U.S.C. § 1981.  Moreover, Plaintiff has suffered financial loss, economic loss, loss of employment, shame, humiliation, and emotional distress and trauma. Plaintiff seeks declaratory and injunctive relief, compensatory and punitive damages, costs, attorney's fees and any and all such other relief the trier of fact may assess.

**WHEREFORE**, premises considered, Plaintiff respectfully requests that this Court:

(a)     grant a permanent injunction enjoining Defendants, their officers, successors and assigns and all persons in active concert or participation with such conduct from engaging in further discriminatory treatment on the basis of race;

(b)     order Defendants to institute and carry out policies, practices and programs that provide equal provisions and employment opportunities for all employees that eradicate the effects of past and present unlawful employment practices, including implementing a policy against race discrimination in the workplace;

(c)     order Defendants to make Plaintiff whole by providing appropriate back pay and front pay with prejudgment interest, amounts to be proved at trial,

and other affirmative relief necessary to eradicate the effects of their unlawful employment practices.

(d)    award Plaintiff compensatory, punitive and liquidated damages;

(e)    award Plaintiff his costs and expenses herein, including costs and a reasonable attorney's fee; and

(f)  award Plaintiff such other relief that this Court deems necessary and proper.

COUNT II

THIRD PARTY RACIAL HARASSMENT

37.    Plaintiff adopts and realleges paragraphs 1-36 as if fully recited herein.  This is a claim to redress the unlawful employment practice of racial harassment prohibited by 42 U.S.C. § 1981.

38.    Plaintiff avers that he has been racially harassed by a third party and that on numerous occasions he made Defendants aware of the said harassment and requested that Defendants intervene to stop the said harassment, but Defendants failed or refused to take prompt, remedial actions to stop the harassment despite a legal duty to do so.  The said harassment was unwelcome and it was severe and pervasive.

39.    As a proximate result of Defendants' unlawful third party racial harassment, Plaintiff has suffered financial loss, economic loss, loss of

employment, shame, humiliation, and emotional distress and trauma.  Plaintiff

seeks declaratory and injunctive relief, compensatory and punitive damages, costs,

attorney's fees and any and all such other relief the trier of fact may assess.

**WHEREFORE**, premises considered, Plaintiff respectfully requests that

this Court:

(a)     grant a permanent injunction enjoining Defendants, their officers,

successors and assigns and all persons in active concert or participation with such

conduct from engaging in further discriminatory treatment on the basis of race;

(b)     order Defendants to institute and carry out policies, practices and

programs that provide equal provisions and employment opportunities for all

employees that eradicate the effects of past and present unlawful employment

practices, including implementing a policy against race discrimination in the

workplace;

(c)     order Defendants to make Plaintiff whole by providing appropriate

back pay and front pay with prejudgment interest, amounts to be proved at trial,

and other affirmative relief necessary to eradicate the effects of their unlawful

employment practices.

(d)     award Plaintiff compensatory, punitive and liquidated damages;

(e)     award Plaintiff his costs and expenses herein, including costs and a

reasonable attorney's fee; and

(f)  award Plaintiff such other relief that this Court deems necessary and proper.

## COUNT III

## RETALIATION

40.    Plaintiff adopts and realleges paragraphs 1-39 as if fully recited herein.  This is a claim to redress the unlawful employment practice of racial discrimination prepared by § 1981.

41.    Plaintiff avers that he opposed a practice made unlawful by 42 U.S.C. § 1981; that he suffered a materially adverse employment action and that there is a causal link between the protected activity and the adverse action.

42.    As a proximate result of Defendants' unlawful retaliation, Plaintiff has suffered financial loss, economic loss, loss of employment, shame, humiliation, and emotional distress and trauma.  Plaintiff seeks declaratory and injunctive relief, compensatory and punitive damages, costs, attorney's fees and any and all such other relief the trier of fact may assess.

**WHEREFORE**, premises considered, Plaintiff respectfully requests that this Court:

(a)    grant a permanent injunction enjoining Defendants, their officers, successors and assigns and all persons in active concert or participation with such conduct from engaging in further discriminatory treatment on the basis of race;

(b)      order Defendants to institute and carry out policies, practices and programs that provide equal provisions and employment opportunities for all employees that eradicate the effects of past and present unlawful employment practices, including implementing a policy against race discrimination in the workplace;

(c)      order Defendants to make Plaintiff whole by providing appropriate back pay and front pay with prejudgment interest, amounts to be proved at trial, and other affirmative relief necessary to eradicate the effects of their unlawful employment practices.

(d)      award Plaintiff compensatory, punitive and liquidated damages;

(e)      award Plaintiff his costs and expenses herein, including costs and a reasonable attorney's fee; and

(f)  award Plaintiff such other relief that this Court deems necessary and proper.

Respectfully submitted,

*Attorneys for Plaintiff*

/s/  John A. Wilmer
**John A. Wilmer** (ASB-7110-R73J)

/s/ Walter A. Kelley
**Walter A. Kelley** (ASB-8687-L54W)

**OF COUNSEL:**
WILMER AND LEE, P.A.

100 Washington Street, Suite 200
Huntsville, Alabama 35801
256-533-0202 (Telephone)
256-533-0302 (Facsimile)
jwilmer@wilmerlee.com
wkelley@wilmerlee.com

**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY
ON ALL ISSUES TRIABLE TO A JURY**