# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **FRED MOORE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 5:14-CV-02020-MHH** |
| | ) | |
| **POOL CORPORATION, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This case concerns the way in which plaintiff Fred Moore's employer responded when Mr. Moore, who is African-American, complained that one of his customers repeatedly called him a "nigger." Mr. Moore asserts that the customer's behavior was intolerable because the customer demeaned him in front of the employees who Mr. Moore supervised and harassed him in the presence of other customers. Mr. Moore contends that his employer failed to address the harassment. Mr. Moore also asserts that his employer fired him because he complained about the customer's conduct. Mr. Moore seeks relief under 42 U.S.C. § 1981 for racial harassment and retaliatory discharge.[1]

---

[1] Initially, Mr. Moore also asserted a race discrimination claim. Mr. Moore has abandoned that claim. (Doc. 69, p. 2). The Court will enter judgment for the defendants on that claim.

1

The defendants are Superior Pool Products, LLC and SCP Distributors, LLC.[2]  Both companies are subsidiaries of Pool Corporation; Pool Corporation operates under the name POOLCORP.  (Doc. 68-1, p. 6).  POOLCORP does not have employees; it operates entirely through subsidiary companies.  (Doc. 68-1, p. 6; Doc. 68-2, p. 6).  In this opinion, the Court frequently refers to the defendants as POOLCORP, but the Court makes specific reference to Superior and SCP when necessary for purposes of clarity.  The defendants ask the Court to enter judgment on Mr. Moore's § 1981 claims.  (Doc. 61).  This opinion resolves the defendants' summary judgment motion.

## I.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ.

---

[2] By agreement of the parties, the Court previously dismissed with prejudice Mr. Moore's claims against POOLCORP because POOLCORP is not his employer.  (Doc. 54).

P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). In keeping with the summary judgment standard, to the extent that factual inferences are drawn from the Rule 56 record, they are drawn in favor of Mr. Moore, the non-movant.

## II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.    Mr. Moore's Employment with POOLCORP

Mr. Moore worked in the pool products business for more than 25 years. (Doc. 71, p. 2, ¶ 1). He was working as a branch manager for Hughes Supply Company in Huntsville in 2001 when POOLCORP and its subsidiaries acquired Hughes Supply Company and became his employers. (Doc. 71, p. 2, ¶ 1; Doc. 68-2, pp. 7, 11). Under POOLCORP, the Huntsville location was designated as Superior Branch 403A, and Mr. Moore continued as the manager for the branch. (*See* Doc. 68-4, p. 57). In total, Mr. Moore served as branch manager, or sales center manager, for that location for more than 20 years. (*See* Doc. 71, p. 2, ¶ 1).

As the sales center manager, Mr. Moore was the highest ranked employee in the Huntsville branch. He supervised from 10 to 12 employees at a time. (Doc.

68-2, p. 11; Doc. 71, p. 2, ¶ 1). According to the job description for the sales center manager position, Mr. Moore had "complete responsibility for developing and managing a business operation that increase[d] sales, profitability, market share, and customer and employee satisfaction by directing, coordinating and monitoring all sales, sales center operation and personnel developments activities." (Doc. 63, p. 2; Doc. 68-4, p. 114). As sales center manager, Mr. Moore had to demonstrate professionalism, in part by "approach[ing] others in a tactful manner [and] . . . [t]reat[ing] others with respect and consideration, regardless of position or status." (Doc. 63, p. 2; Doc. 68-4, pp. 114-15). Mr. Moore also had to ensure that the Huntsville branch had good profit margins. (*See* Doc. 63, p. 2; Doc. 68-4, p. 79).

Sales for the Huntsville branch grew significantly under Mr. Moore's management. When Mr. Moore became branch manager in 1991, sales for the branch were approximately $800,000 per year; by 2014, sales for the Huntsville branch exceeded six million dollars per year. (Doc. 71, pp. 2-3, ¶ 2). Mr. Moore's branch always was one of the highest in gross sales and net profit for the region in which he worked, and the Huntsville branch made its "profit budget" in 2010, 2011, and 2012. (Doc. 71, pp. 2-3, ¶ 2; Doc. 68-3, p. 46). The Huntsville branch was on track to make its profit budget in 2014 when POOLCORP terminated Mr. Moore's employment. (*See* Doc. 68-23, pp. 63-65).

In 2014, John Ferrer and Scotty Frantz supervised Mr. Moore's work. Mr. Frantz worked for Superior; his title was General Manager. Mr. Ferrer worked for SCP Distributors; his title was Regional Manager. (Doc. 68-2, pp. 17-18; Doc. 68-3, pp. 6-7; Doc. 68-4, pp. 53-54).

## B. POOLCORP's Anti-Harassment Policy

When POOLCORP became Mr. Moore's employer, he received the company's employee handbook, and he had to comply with the policies contained within it. (Doc. 60-5; Doc. 68-4, pp. 40, 45). The portion of the handbook devoted to "Corporate Vision and Statements" contains a section entitled "Unlawful Harassment Policy." (Doc. 68-1, p. 3). The "Unlawful Harassment Policy" begins as follows:

> [POOLCORP] maintains a strict policy prohibiting any type of unlawful harassment, and strives to provide an environment that is pleasant, healthful, comfortable, and free from intimidation, hostility, or other offenses which might interfere with work performance. Unlawful harassment of any sort . . . will not be tolerated.

(Doc. 68-1, p. 10, § 11) (emphasis in original). The policy applies not only to POOLCORP personnel but also to "clients, customers, and outside vendors of [POOLCORP]." (Doc. 68-1, p. 10, § 11).[3] The policy "strictly prohibit[s]" harassment on the basis of race and identifies as harassing conduct racial slurs and

---

[3] POOLCORP's corporate representative confirmed that the company's "Unlawful Harassment Policy" prohibits third-party harassment or customer harassment. (Doc. 68-2, pp. 27-28).

"any name-calling or acts of physical violence or intimidation that are based on an employee's race . . . ."  (Doc. 68-1, p. 10, § 11)

The handbook offers employees who experience harassment at the hands of a manager or co-employee various avenues for reporting the conduct, and the policy requires any employee who becomes aware of harassing conduct to report the conduct using these same avenues.  (*See* Doc. 68-1, p. 10, § 11).  The policy instructs:

> If an employee believes that he or she has been subjected to [harassing] conduct by a co-employee or manager or any employee who becomes aware of an incident of harassment, whether by witnessing the incident or being told of it, must report it to the Human Resources Manager, Senior Director of Human Resources, Regional or General Manager, Corporate or Group Vice President, President or General Counsel.  Employees may also use Ethicspoint to report any such incidents.

(Doc. 68-1, p. 10, § 11).  POOLCORP stated in its policy that it would "investigate[] promptly, examine[] impartially, and resolve[] [] as promptly as possible" all complaints about or incidents or practices of harassment.  (Doc. 68-1, p. 10, § 11).  The policy strictly prohibits retaliation for "good faith reporting of any alleged harassment."  (Doc. 68-1, p. 10, § 11).  The harassment policy was in effect in the years 2013 and 2014.  (Doc. 68-2, p. 27).

The ways in which POOLCORP investigates reports of harassment varies; "it depends on the type of harassment.  It depends on who the harasser is."  (Doc. 68-2, p. 30).  Sometimes company managers conduct investigations; sometimes

members of POOLCORP's Department of Human Resources conduct an investigation. (Doc. 68-2, p. 31). When POOLCORP receives a report that a POOLCORP customer has harassed a POOLCORP employee, "each situation is handled differently." (Doc. 68-2, p. 32). Although POOLCORP's written policy says that an employee who becomes aware of "an incident of harassment . . . must report" the incident to Human Resources or to a member of management or corporate leadership, POOLCORP's corporate representative testified that it would not necessarily be a violation of company policy for a manager to fail to report an incident of harassment because "[w]orkplace harassment needs to be severe and pervasive and it needs to negatively affect an employee's job and their employment." (Doc. 68-2, pp. 46-47). According to POOLCORP's Senior Director of Human Resources, "[i]n not all cases that is the situation." (Doc. 68-2, p. 47). Still, the HR Director acknowledged that a regional or district manager should report an incident of harassment up the chain of command. (Doc. 68-2, p. 48).

POOLCORP conducts training programs related to the company's Unlawful Harassment Policy. The training program includes a component on third-party harassment. All managers and supervisors must participate in the training program. (Doc. 68-2, p. 30, pp. 32-33). Accordingly, Mr. Frantz and Mr. Ferrer attended training courses relating to discrimination, harassment, and retaliation,

and the courses included information about third-party harassment.  (Doc. 68-3, pp. 18-19).

## C.     Harassment by a POOLCORP Customer

POOLCORP had a fiscally-lucrative, foul-mouthed customer in the Huntsville area.  This customer bought approximately $250,000 - $300,000 of pool supplies annually from Superior.  (Doc. 68-3, p. 28).   His business was desirable; his temper was not.  When this customer became stressed, he vented, and he took out his frustrations on Mr. Moore, cursing at Mr. Moore and calling him names like "nigger," "goddamned nigger," "head nigger," "head nigger in charge," and other variations of the racial epithet.  (Doc. 68-4, pp. 207-208, 211).  Mr. Moore estimates that the customer directed racial slurs toward him six or seven times a year between 2009 and 2014.  (Doc. 68-4, p. 209).  When the customer would call to order supplies, he would ask the employee who answered the phone to put "the head nigger in charge" on the phone.  (Doc. 68-4, p. 208; Doc. 68-5, p. 78).  When he visited Superior's store, the customer would call Mr. Moore a "nigger" at the counter in front of POOLCORP employees and customers.  (Doc. 68-4, p. 210).

The employees in the Huntsville branch talked about the way in which the customer spoke to and about Mr. Moore, but they did not report the customer's conduct, per POOLCORP's Unlawful Harassment Policy.  (*See* Doc. 68-4, p. 209; Doc. 68-5, p. 79; Doc. 68-6, pp. 73-76, 111; Doc. 68-7, pp. 24-25; Doc. 68-8, p. 2;

8

Doc. 68-21, p. 96; Doc. 60-31, p. 47). Mr. Moore described the customer's conduct as "terrible" and "devastating." (Doc. 68-4, p. 207, 210). He testified that it was "horrible[] for any human being to have to live through that." (Doc. 68-4, p. 210). Mr. Moore admits that he probably cussed in front of other customers when the harassing customer called him names. (*See* Doc. 68-4, p. 210). He stated, "that really, really puts me in a bad predicament when someone calling you a black nigger, head nigger, and you got all these customers in front of you and employees and you have to listen to that on this ear and look at the people with your eyes; and then [] maintain your cool." (Doc. 68-4, p. 210-211).

Mr. Moore asked the customer to stop using the racial epithet, but Mr. Moore testified that there "[w]as[] no stopping him . . . ." (Doc. 68-4, p. 209). If Mr. Moore hung up on the customer, the customer would call back and ask the employee who answered the phone to "[t]ell that black nigger he don't hang up on me." (Doc. 68-4, pp. 209-10). The customer's conduct was atrocious.

### D.  <u>Reporting the Customer's Harassment</u>

Mr. Moore reported the customer's conduct to Mr. Frantz. (Doc. 68-4, p. 211).[4] In 2005 or 2006, during a conversation between Mr. Frantz, Ilyasha Anderson (the Operations Manager for Superior's Huntsville branch), and Mr.

---

[4] Mr. Frantz testified that Mr. Moore's wife, rather than Mr. Moore, told him about the customer's conduct, but Mr. Frantz admitted that before Ms. Moore reported the harassment, Mr. Moore played a voicemail for him in which the customer referred to Mr. Moore as a "nigger." (Doc. 68-3, pp. 23-24).

Moore, Ms. Anderson asked if they could "fire" the customer. (Doc. 68-4, p. 212; Doc. 68-8, p. 2). Mr. Frantz replied that they could fire the customer, but he would not remove the value of the customer's annual gross sales from Mr. Moore's branch sales target. (Doc. 68-4, p. 212; *see also* Doc. 68-3, p. 27; Doc. 68-6, pp. 79-81). Mr. Moore explained that "was a no win" situation because he either had to put up with the customer's conduct to keep the customer's sales or "get fired because you don't hit budget." (Doc. 68-4, p. 212). Additionally, if Mr. Moore could not to replace the customer's business in his annual budget, it may have negatively impacted his bonus for that year and for years to come. (Doc. 68-3, p. 28; Doc. 68-6, pp. 79-81, 129-30; Doc. 71, p. 4, ¶ 5). Although Mr. Frantz told Mr. Moore that he could fire the customer, Mr. Frantz did not recommend to anyone in POOLCORP's top management that the company should fire the customer because of the harassment; Mr. Frantz made that recommendation only to Mr. Moore. (Doc. 68-3, pp. 32-33).

Mr. Moore had Mr. Frantz listen to a recorded telephone message in which the customer called Mr. Moore a "nigger." (Doc. 68-4, p. 213; Doc. 68-3, pp. 23-24; Doc. 71, p. 4, ¶ 7). Mr. Moore said to Mr. Frantz, "just listen to what I have to go through." (Doc. 68-4, p. 214). Mr. Moore testified that "nothing got done

about it;" Mr. Frantz did not help him. (Doc. 68-4, p. 214).[5] Mr. Moore also discussed the racial slurs with Dave Grendel, Tig Blake, and John Ferrer, the three regional managers who supervised him. (Doc. 68-4, pp. 215-216; *see also* Doc. 71, pp. 3-4, ¶ 5).[6]

In the fall of 2013, when she knew that Mr. Franz and Mr. Ferrer would be in the Huntsville branch office, Mr. Moore's wife visited the office and asked for permission to confront the customer about his use of racial slurs. (Doc. 68-4, p. 216; Doc. 68-3, pp. 35-36; Doc. 68-12, ¶ 1; Doc. 68-13, pp. 44, 58). Ms. Moore told Mr. Franz and Mr. Ferrer that she did not want to get her husband fired, but the customer's use of the racial slurs had to stop. (Doc. 68-4, p. 222). Mr. Frantz told Ms. Moore that she could speak to the customer. (Doc. 68-4, p. 222; Doc. 68-3, p. 36).

One month later, in December 2013, Ms. Moore had her opportunity to speak with the customer during a company customer appreciation trip. (Doc. 68-4,

---

[5] Mr. Frantz testified that he told Mr. Moore that the customer's behavior was "inappropriate" and then "asked [Mr. Moore] if [he] needed to get involved . . . ." (Doc. 68-3, p. 25). According to Mr. Frantz, Mr. Moore responded by telling him that he could "deal with" the customer, and Mr. Frantz needed "to stay out of it." (Doc. 68-3, pp. 25-26; *see also* Doc. 68-3, pp. 36-37). Mr. Moore testified that he does not remember telling Mr. Frantz that he could handle the customer on his own and not to contact the customer, and he asserts that he told Mr. Frantz about the harassment because he wanted it stopped. (Doc. 68-4, pp. 228-229; Doc. 71, pp. 3-4, ¶ 5). Mr. Frantz does not remember if he followed up with Mr. Moore after he learned of the customer's harassment or if the customer agreed to stop using racial slurs. (Doc. 68-3, p. 26). For purposes of summary judgment, the Court draws all inferences from this conflicting testimony in favor of Mr. Moore.

[6] Mr. Moore had Mr. Blake, his regional manager from 2005 – 2008, listen to a voice message in which the customer called Mr. Moore a "nigger." (Doc. 60-27, ¶¶ 3, 6).

pp. 223-224; Doc. 68-12, ¶ 2; Doc. 68-13, p. 62).  Ms. Moore told the customer that he had to stop using calling her husband a "nigger."  (Doc. 68-4, p. 224; Doc. 68-13, p. 62).  Mr. Moore told Mr. Ferrer and Mr. Frantz that his wife spoke with the customer and told him to stop the harassment.  (Doc. 68-4, pp. 227-228; Doc. 71, p. 4, ¶ 6).  After the trip, the customer continued to direct racial epithets to Mr. Moore.  (Doc. 68-4, pp. 226-227).

### E. <u>Alleged Retaliatory Acts</u>

Mr. Moore asserts that Mr. Ferrer and Mr. Frantz treated him differently after he last complained about the customer's harassment and informed them that his wife confronted the customer about the harassment.  Prior to November 2013, Mr. Moore's job responsibilities included selecting employees to work at the Huntsville Branch.  (Doc. 71, p. 4, ¶ 8; *see also* 68-5, p. 16-17; Doc. 60-31, p. 12).  Then, in late November or early December 2013, Mr. Ferrer interviewed Michael Thrash to fill the vacant operations manager position at the Huntsville Branch.  (Doc. 71, p. 4, ¶ 8).  Although Mr. Moore recommended a different candidate, Mr. Ferrer and Mr. Frantz chose Mr. Thrash to be the operations manager.  (Doc. 71, p. 4, ¶ 8; Doc. 68-2, p. 16).  When an inside sales position needed to be filled at the Huntsville Branch in March 2014, Mr. Ferrer handled the interviews and selected the candidate for the position.  (Doc. 71, p. 4, ¶ 8).

Additionally, in late 2013 and early 2014, Mr. Moore noticed that his interaction with Mr. Ferrer became infrequent. (Doc. 71, p. 5, ¶¶ 9, 10; *see also* Doc. 68-4, p. 71). Mr. Moore had been talking to Mr. Ferrer on the phone once a week or so, but in 2014 Mr. Ferrer stopped answering Mr. Moore's phone calls. (Doc. 68-4, pp. 70-71). Instead of talking to Mr. Moore, Mr. Ferrer began communicating directly with Mr. Moore's employees, and when he visited the Huntsville branch, Mr. Ferrer spent his time with Phillip Works, a branch employee, and Mr. Thrash instead of Mr. Moore. (Doc. 71, p. 5, ¶ 10).

On May 22, 2014, Mr. Ferrer sent Pat Finger, POOLCORP's Senior Human Resources Director, an email discussing complaints from four customers regarding Mr. Moore. (Doc. 68-9, p. 82; Doc. 71-4, p. 2; Doc. 71-5, pp. 2-3). Mr. Ferrer did not discuss the complaints with Mr. Moore before sending the email to Ms. Finger. (Doc. 68-9, pp. 82-83).

Mr. Frantz and Mr. Ferrer visited the branch office in early June 2014, and they met separately with customers, Mr. Thrash, and Mr. Moore. (*See* Doc. 71, p. 7, ¶ 15; Doc. 68-3, p. 102). Mr. Frantz and Mr. Ferrer testified that they discussed Mr. Moore's management of the branch and customer complaints during their meeting, but according to Mr. Moore, Mr. Frantz and Mr. Ferrer tried to coerce him into quitting. (Doc. 68-3, p. 102; Doc. 71, p. 7, ¶ 15). Mr. Moore did not have

contact with Mr. Frantz and Mr. Ferrer again until they visited the branch to fire him.

### F.     Mr. Moore's Termination

In August 2014, Mr. Frantz, Mr. Ferrer, Mike Lillie (the future regional manager for the Huntsville branch), and Tommy Canady (the future general manager for the branch) decided together to terminate Mr. Moore's employment. (Doc. 60-14, p. 94; Doc. 68-2, pp. 23 & 25; Doc. 68-3, pp. 90, 92, 96; Doc. 68-23, pp. 12-13, 94).  They made the decision during a meeting in Texas.  Ms. Finger also attended the meeting.  (Doc. 68-9, p. 11; Doc. 68-23, p. 87).  During the meeting, the group discussed customer complaints, Mr. Moore's performance, his reputation in the market, and his management style.  (Doc. 68-3, p. 89; Doc. 68-9, p. 16).[7]  During the meeting, no one discussed Mr. Moore's harassment allegations regarding the POOLCORP customer.  Mr. Lillie and Ms. Finger did not know about the harassment.  (Doc. 68-2, pp. 45-47; Doc. 68-9, p. 17:14; Doc. 68-23, pp. 89-90).

Mr. Frantz and Mr. Ferrer met with Mr. Moore on September 3, 2014 at the branch office to terminate his employment.  (Doc. 71-10, p. 2).  Mr. Moore asked why he was being fired.   Mr. Frantz testified that he told Mr. Moore that

---

[7] The performance issues included a concern regarding missing inventory in the Huntsville branch.  (Doc. 68-3, p. 90).  Mr. Thrash reported the issue to Mr. Ferrer.  (Doc. 68-3, p. 91).  Mr. Frantz does not remember ever discussing with Mr. Moore an accusation that he (Mr. Moore) was stealing inventory.  (Doc. 68-3, p. 97).

POOLCORP was receiving "too many customer complaints and also several employees had complained and were resigning because of him." (Doc. 68-3, p. 66). Mr. Moore asserts that customer complaints were the only reasons Mr. Frantz gave him for his termination. (Doc. 68-4, p. 244).

The day after POOLCORP fired Mr. Moore, Mr. Lillie called Mr. Works to offer him the sales center manager position for the Huntsville branch. (*See* Doc. 68-5, p. 74). Shortly after the telephone conversation, Mr. Works received an offer letter from Mr. Lillie, which Mr. Works promptly signed and returned. (Doc. 68-5, p. 74; Doc. 71-7, p. 2). Mr. Works began working as the sales center manager a few days after he accepted the offer. (Doc. 68-5, p. 77).

## III. ANALYSIS

### A. <u>Racial Harassment</u>

Mr. Moore asserts claims against the defendants under 42 U.S.C. § 1981 for racial harassment and retaliation. (Doc. 18). Section 1981 "prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999) (citation omitted).[8] Mr. Moore asserts that the defendants violated § 1981 by subjecting him to racial harassment and a hostile work environment by

---

[8] Title VII and § 1981 "have the same requirements of proof and use the same analytical framework . . . ." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Therefore, cases involving Title VII claims are persuasive authority for analyzing Mr. Moore's § 1981 claims.

forcing him to work with a customer who routinely used racial slurs when he and the customer interacted. (Doc. 18, ¶¶ 38-40).

To prove racial harassment, Mr. Moore must show that his "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993)) (internal marks omitted). To avoid summary judgment, Mr. Moore must present evidence from which a jury could find that: (1) he is a member of a protected class; (2) he was subject to unwelcome harassment; (3) the harassment was based on his race; (4) the harassment was severe or pervasive enough to alter the terms and conditions of his employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for the harassment under a theory of either direct or vicarious liability. *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1248-49 (11th Cir. 2014); *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300 (11th Cir. 2010). Mr. Moore is a member of a protected class. The defendants do not dispute that Mr. Moore was subject to harassment based on his race or contend that they are not responsible for the harassment under a theory of direct or vicarious liability. (*See* Doc. 61-1, pp. 31-35). Instead, the defendants argue that Mr. Moore's racial harassment claim must fail as a matter of law because he

cannot establish that the harassment he experienced was unwelcome or sufficiently severe or pervasive.  (Doc. 61-1 at 31-35).

        1.    <u>Unwelcome harassment</u>

The defendants argue that the harassment Mr. Moore experienced from a POOLCORP customer was not unwelcome because Mr. Moore (1) "elected" not to fire the customer after Mr. Frantz gave him permission to do so, (2) went to dinner with the customer, (3) invited the customer on a customer appreciation trip, and (4) visited the customer in the hospital.  (*See* Doc. 61-1, pp. 34-35; Doc. 72, pp. 14-15).  These arguments are entirely unpersuasive.

For harassment to be actionable, the conduct must be "unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive."  *Henson v. City of Dundee*, 682 F.2d 897, 903 (11th Cir. 1982).  There is nothing in the record to suggest that Mr. Moore solicited or provoked the POOLCORP customer to call him a "nigger."  There is no conduct that warrants the use of racial slurs to degrade someone, and the Court cannot imagine a set of circumstances in which an African-American employee would invite a Caucasian customer to call him "nigger."  Mr. Moore testified that the customer's conduct was "devastating," "terrible," and "horrible."  (Doc. 68-4, pp. 207, 210).

The defendants argue that Mr. Moore's decision not to terminate or fire the POOLCORP customer after Mr. Frantz gave him permission to do so shows that the harassment was not unwelcome. (Doc. 61-1, p. 34). But POOLCORP omits from its argument the price that POOLCORP exacted from Mr. Moore for the "option" of firing the customer. It undisputed that Mr. Frantz told Mr. Moore that he would not remove the customer's business from the Huntsville branch's budget. (Doc. 68-3, pp. 27-28, 34; 68-4, p. 213). As a result, if Mr. Moore exercised his "option" to fire the customer, he would have had to find $250,000 – $300,000 worth of new business to make the budget and be eligible for a bonus. (Doc. 68-3, p. 28). This amounts to a Hobson's choice and in no way suggests that Mr. Moore welcomed the customer's discriminatory conduct.

The defendants also point out that Mr. Moore had dinner with the customer, invited him on a customer appreciation trip, and visited him at least twice in the hospital. (Doc. 61-1, pp. 34-35; Doc. 72, pp. 14-15). Mr. Moore testified that he interacted with the customer "to represent the company well" and to fulfill his obligations to POOLCORP. (Doc. 68-4, pp. 204-05). Tellingly, Mr. Moore did not go to dinner or travel with the customer after his employment with POOLCORP ended. (*See* 68-4, p. 206). A jury could reasonably conclude that Mr. Moore had social contact with the customer only because his job required it.

Thus, a jury must decide whether the customer's use of racial slurs to refer to Mr. Moore was unwelcome harassment.

## 2. Severe or pervasive harassment

"'The determination of whether race-based harassment was so severe or pervasive as to alter the conditions of employment includes both subjective and objective components." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1299 (11th Cir. 2012) (quoting *EEOC v. Xerxes Corp.*, 639 F.3d 658, 676 (4th Cir. 2011)). Mr. Moore must show that he "subjectively perceive[d] the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808-09 (11th Cir. 2010) (*en banc*). The objective component of the analysis is a fact-intensive inquiry, and "the Supreme Court and [Eleventh Circuit] have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (citing *Allen v. Tyson Foods*,

121 F.3d 642, 647 (11th Cir. 1997), citing in turn *Harris*, 510 U.S. at 23). No single factor is dispositive. *Miller*, 277 F.3d at 1276.

The defendants do not expressly argue that Mr. Moore did not subjectively perceive the harassment as sufficiently severe or pervasive to alter the terms of his employment. (*See* Doc. 61-1, pp. 31-35).[9] Mr. Moore testified that the harassment "was devastating." (Doc. 68-4, p. 207). The situation was so bad that Mr. Moore's wife felt that she needed to intervene. Thus, a jury reasonably could infer that Mr. Moore subjectively perceived the customer's harassment as severe and pervasive enough to alter the terms and conditions of his employment.

The defendants argue that they are entitled to judgment on Mr. Moore's harassment claim because Mr. Moore cannot prove that the customer's harassing conduct was objectively severe or pervasive. (Doc. 61-1, pp. 32-35). The defendants assert that because the conduct "was limited to five to seven times a year over several years," the conduct was not severe or pervasive. (Doc. 61-1, pp. 32-33). The Eleventh Circuit Court of Appeals has held that there is not a "'magic number' of racial or ethnic insults" that an employee must tolerate before racial harassment rises to the level of severe or pervasive. *Miller*, 277 F.3d at 1276 ("'repeated incidents of verbal harassment that continue despite the employee's

_____

[9] As discussed above, the defendants argued that the harassment was not unwelcome. (Doc. 61-1, pp. 31-25; Doc. 72, pp. 14-15). To the extent that the defendants' argument suggests that Mr. Moore did not subjectively perceive the harassment as severe or pervasive enough to alter the terms and conditions of his employment, the Court is not persuaded. *See* pp. 19-21, *supra*.

objections that are indicative of a hostile work environment' . . . .") (quoting *Shanoff v. Illinois Dep't of Human Servs.*, 258 F.3d 696, 704 (7th Cir. 2001)) (alteration in original omitted).

Here, not only did the customer call Mr. Moore a "nigger" five to seven times a year over a period of years, but the customer's harassment continued after Mr. Moore objected to the racial epithet and asked the customer to stop using the offensive slur. (Doc. 68-4, pp. 209, 211-12). Although both Mr. Blake and Mr. Frantz became aware of the harassment in 2004 or 2005, the customer continued to call Mr. Moore the racial epithet. (Doc. 60-27, ¶¶ 5-6; Doc. 68-4, pp. 209, 211; Doc. 68-2, p. 2). From this evidence, jurors reasonably could conclude that the customer's habitual racial harassment was severe or pervasive enough to objectively alter the terms and conditions of Mr. Moore's employment.

The defendants also argue that the customer's harassment did not unreasonably interfere with Mr. Moore's job performance because Mr. Moore "requested that management not become involved and represented that he could handle" the customer, and Mr. Moore neither reported the customer's conduct to POOLCORP's human resources department nor used POOLCORP's Ethics Point hotline to report the conduct. (Doc. 61-1, pp. 33-34). Mr. Moore testified that he told Mr. Frantz and Mr. Ferrer about the harassment "because [he] wanted it stopped." (Doc. 71, p. 3, ¶ 5). A jury must resolve this factual dispute. Moreover,

POOLCORP's Unlawful Harassment Policy expressly provides that employees may report complaints of harassment to "the Regional or General Manager . . . ." (Doc. 60-27, ¶ 6; Doc. 68-1, p. 10; Doc. 68-4, pp. 211-13). Mr. Moore did just that when he reported the customer's harassing conduct to Mr. Frantz, Mr. Blake, and Mr. Ferrer, his regional managers and general manager. And a jury could conclude that a harassment policy that comes with a $250,000 price tag is no policy at all.[10]

Finally, the defendants argue that the customer's harassment of Mr. Moore "was not severe or pervasive given that it was not physically threatening or humiliating and was limited to racial slurs." (Doc. 61-1, p. 35). Harassment does not have to be physically threatening to be considered severe or pervasive. *See Miller*, 277 F.3d at 1276-77. The Court rejects the defendants' argument that an employee is not humiliated when a customer calls him a "nigger." "Far more than a 'mere offensive utterance,' the work 'nigger' is pure anathema to African-Americans. 'Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as "nigger" by a supervisor in the presence of his subordinates.'" *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) (quoting *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th

---

[10] The defendants reiterate their argument that Mr. Moore did not "fire" the customer, and Mr. Moore engaged in social interactions with the customer. The Court already has addressed those arguments.

Cir. 1993)). Here, the customer used the term "nigger" to refer to Mr. Moore in the presence of other customers and employees who reported to Mr. Moore. This is no less humiliating than a supervisor using the epithet in the presence of other employees.[11]

Thus, the defendants have not shown that, as a matter of law, the harassment Mr. Moore experienced was not sufficiently severe or pervasive to alter the terms and conditions of his employment. As a result, the defendants have not established that they are entitled to summary judgment on Mr. Moore's racial harassment claim. The Court denies their motion for summary judgment on that claim.

---

[11] The facts of the present case are distinguishable from the facts of the appellate decisions on which the defendants rely. *McCann v. Tillm*an, 526 F.3d 1370, 1378-79 (11th Cir. 2008) ("the only racially insensitive comments [the plaintiff] heard between 2003 and 2005 were when [a supervisor] called her 'girl' and called two male black employees 'boys," and the plaintiff was not explicitly called a racial slur and did not hear the term "nigger" spoken in her presence at work); *Barrow v. Georgia Pacific Corporation*, 144 Fed. Appx. 54, 57-58 (11th Cir. 2005) (persuasive, not binding, authority; plaintiff did not establish his hostile work environment claim when he presented evidence of the following incidents involving the use of racial slurs during more than fourteen years of employment: (1) "a superintendent called him 'nigger' three times in one year, repeatedly called him 'boy,' and told him two or three times that he was going to kick [the plaintiff's] 'black ass';" (2) "his supervisor [] called him a 'nigger' and told him that if he looked at 'that white girl' he would 'cut' him; and (3) another superintendent called the plaintiff "black boy" on one occasion; in finding that the use of racial slurs was not sufficiently severe or pervasive to establish the plaintiff's hostile work environment claim, the Eleventh Circuit noted that there was no evidence to show that the harassing conduct "occurred on a continuous basis . . . ."). The defendants also cite several unreported district court opinions to support their argument that the customer's harassment was not frequent enough to be severe or pervasive, but none of those decisions involve a plaintiff who was repeatedly called a "nigger" over a period of years, even after the employee complained to his management about the harassment. *See Williams v. Ruskin Co., Reliable Div.*, 2012 WL 692964 (M.D. Ala. March 1, 2012); *Zeigler v. Alabama Dep't of Human Res.*, 710 F. Supp. 1229 (M.D. Ala. 2010); *Brown v. Progress Energy*, 2009 WL 212426 (M.D. Fla. Jan. 29, 2009) *aff'd*, 364 Fed. Appx. 556 (11th Cir. 2010); *Quarles v. Con-Way Freight, Inc.*, 2008 WL 1994916 (M.D. Fla. May 8, 2008); *Evans v. Pemco Aeroplex, Inc.*, 1998 WL 1048470 (N.D. Ala. Feb. 23, 1998).

## B.      Retaliation

Section 1981 prohibits employers from retaliating against a person because he opposed a practice prohibited by § 1981.  *Wells v. Gen. Dynamics Information Tech. Inc.*, 571 Fed. Appx. 732, 736 (11th Cir. 2014).  Absent direct evidence, the *McDonnell Douglas* burden-shifting analysis applies to retaliation claims.  *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016).[12]  Under this framework, a plaintiff must present evidence to establish a prima facie case of retaliation, which "creates a rebuttable presumption that the employer acted illegally."  *Underwood v. Perry*, 431 F.3d 788, 794 (11th Cir. 2005).  If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate non-retaliatory reason for the adverse employment action.  *Furcron*, 843 F.3d at 1310.  If the employer does this, the burden then shifts back to the plaintiff to show that the employer's proffered reasons are really pretext for discrimination.  *Id.* at 1310-11.

Though it is one tool for examining evidence of discriminatory intent, "'the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion' in Title VII [or § 1981] cases."  *Flowers v. Troup Cty., Ga., School Dist.*, 803 F.3d 1327, 1336 (11th Cir.

---

[12]"Direct evidence is 'evidence, that, if believed proves the existence of a fact without inference or presumption.'"  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (alteration in original omitted).  Mr. Moore does not argue that he produced direct evidence of retaliation, but instead bases his claim on circumstantial evidence of retaliation.  (*See* Doc. 69, pp. 31-36).

2015) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). "The critical decision that must be made is whether the plaintiff has 'create[d] a triable issue concerning the employer's discriminatory intent.'" *Flowers*, 803 F.3d at 1336 (quoting *Lockheed-Martin Corp.*, 644 F.3d at 1328).

A convincing mosaic of circumstantial evidence may be sufficient to allow a jury to infer that discriminatory or retaliatory intent motivated an employment decision. *Lockheed-Martin Corp.*, 644 F.3d at 1328; *see also Calvert v. Doe*, 648 Fed. Appx. 925, 929 (11th. Cir. 2016) (applying the "convincing mosaic" standard to a Title VII retaliation claim).[13] "A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City*, 877 F.3d 1000, 1018 (11th Cir. 2017) (internal quotation marks and citation omitted). If the circumstantial evidence supports a reasonable inference that the employer retaliated against the plaintiff, then summary judgment is improper. *Calvert*, 648 Fed. Appx. at 929; *see also Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256 (11th Cir. 2012)

---

[13] *Calvert* may be cited as persuasive authority, but it is not binding authority because it is an unpublished opinion. *See United States v. Rodrigues-Lopez*, 363 F.3d 1134, 1138 n.4 (11th Cir. 2004) ("While unpublished opinions are not binding on this court, they may nonetheless be cited as persuasive authority."); *see also* 11th Cir. Rule 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

("Whatever form it takes, if the circumstantial evidence is sufficient to raise 'a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.'") (quoting *Lockheed-Martin Corp.*, 644 F.3d at 1328).

      1.   <u>But for causation</u>

In *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013), the Supreme Court held that "retaliation claims must be proved according to traditional principles of but-for causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 360. The defendants argue that Mr. Moore cannot show that retaliation was the but-for cause of his termination because he pled "irreconcilable" claims of race discrimination and retaliation. (Doc. 61-1, pp. 26-27; Doc. 72, pp. 1-3). The argument is not persuasive.

"Rule 8(d) of the Federal Rules of Civil Procedure expressly permits the pleading of alternative and inconsistent claims." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1273 (11th Cir. 2009). In *Savage v. Secure First Credit Union*, 2016 WL 2997171 (11th Cir. May 25, 2016), the Eleventh Circuit reversed one of the decisions that the defendants cite, finding that the district court in that case erred by holding that the plaintiff could not alternatively plead claims for retaliation and discrimination. (*Id.* at *2). Indeed, "it is a well-settled rule of

federal procedure that plaintiffs may assert alternative and contradictory theories of liability." *Adinolfe v. United Techs*. Corp., 768 F.3d 1161, 1175 (11th Cir. 2014).[14] Therefore, the Court turns to the substantive analysis of Mr. Moore's retaliation claim.

### 2. Prima facie case of retaliation

Mr. Moore can prove a prima facie case of retaliation by establishing that (1) he participated in statutorily protected activity, (2) he suffered an adverse employment action, and (3) there is a causal connection between the two events. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010); *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citation omitted). The defendants do not dispute that Mr. Moore participated in statutorily protected activity by reporting the customer's racial harassment to his general and regional

---

[14] In their reply brief, the defendants argue that Mr. Moore cannot establish but-for causation as a matter of law because he testified that he believed his termination was discriminatory. (Doc. 72 at 3-4 (citing Doc. 60-1, pp. 292-93, 298)). Because the defendants raised this argument for the first time in their reply brief, the Court will not consider it. *Herring v. Secretary, Dept. of Corrections*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly have admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.") (citations and internal quotations omitted); *Pennsylvania Nat. Mut. Cas. Ins. Co. v. J.F. Morgan Gen. Contractors, Inc.*, 79 F.Supp.3d 1245, 1256 (N.D. Ala. 2015) (declining to consider an argument raised for the first time in a party's reply brief) (citations omitted). Even if the Court were to consider the argument, Mr. Moore's testimony regarding his subjective belief about his termination is not sufficient by itself to establish that Mr. Moore cannot prove but-for causation as a matter of law.

Because Mr. Moore may plead alternative and contradictory theories of liability, the Court denies without prejudice Mr. Moore's motion to amend his Amended Complaint to dismiss Count I and denies his motion for leave to file a sur-reply brief. (Doc 73). Because of the "but for" standard, Mr. Moore will have to consider how he wishes to proceed at trial.

managers.[15]  (Doc. 61-1, pp. 28-30).  Accordingly, only the last two elements of Mr. Moore's prima facie case are at issue.

a)  *adverse employment action*

An employment action is materially adverse if the challenged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotation marks omitted).  "[P]etty slights, minor annoyances, and simple lack of good manners" are not adverse employment actions.  *See id.*

The defendants argue that Mr. Moore cannot show he suffered an adverse employment action because being left out of hiring decisions is not an adverse action.  (Doc. 61-1 at 28-29).  The argument ignores the fact that Mr. Moore's retaliation claim is based on more than an allegation that he was not included in hiring decisions after he complained about racial harassment.  Instead, Mr. Moore contends that POOLCORP terminated his employment because he complained about racial harassment.  (Doc. 18, pp. 9-10, 14).  Termination is an adverse employment action; the defendants do not argue otherwise.  *See Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008); *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000); *see also* (Doc. 61-1 at 28-29).  Because

---

[15] Internal complaints to supervisors are statutorily protected activity.  *See, e.g., Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001).

POOLCORP terminated Mr. Moore's employment, he can establish that he suffered an adverse employment action.

b) *causal connection*

In a retaliation case, the causation requirement is interpreted broadly. "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Gupta*, 213 F.3d at 590. A plaintiff can show a causal connection "by showing close temporal proximity between the statutorily protected activity and the adverse employment action[, . . . b]ut mere temporal proximity, without more, must be 'very close.'" *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (quoting *Clark County Sch. Dist. V. Breeden*, 532 U.S. 268, 273 (2001)) (internal citation omitted). As explained above, *see* p. 26, a plaintiff must proffer evidence "that the desire to retaliate was the but-for cause of the challenged employment action." *Nassar*, 570 U.S. at 352; *see also Trask v. Secretary, Dep't of Veterans Affairs*, 822 F.3d 1179, 1194 (11th Cir. 2016).

The defendants argue that Mr. Moore cannot establish the causal link element of his prima facie case because too much time passed between Mr.

Moore's last complaint about harassment and his termination. (Doc. 61-1, p. 30).[16]

Under binding precedent, "in the absence of any other evidence tending to show causation, a three-and-one-half month proximity between a protected activity and an adverse employment action is insufficient to create a jury issue on causation." *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006). Mr. Moore last complained to his supervisors about the customer's harassment in November 2013, and POOLCORP terminated his employment almost ten months later in September 2014. (*See* Doc. 68-4, pp. 216; Doc. 71-10, p. 2). Standing alone, the ten-month gap between Mr. Moore's protected activity and his termination is too great to establish a causal link between the two events based on temporal proximity. *See Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006); *Thomas*, 506 F.3d at 1364 (as a matter of law, a three-month span between protected activity and adverse employment action is not sufficient to show causation).

Mr. Moore argues that he is not relying solely on temporal proximity to prove a causal connection, but instead can prove causation based on a series of

---

[16] The defendants also assert that Mr. Moore cannot establish causation because Mr. Lillie did not have knowledge of the customer's harassment when POOLCORP decided to fire Mr. Moore. (Doc. 61-1, p. 30). The significance of Mr. Lillie's role in the decision to terminate Mr. Moore is not clear from the record. (*See* Doc. 68-23, p 94). Mr. Ferrer testified that Mr. Lillie's contribution was simply to give "input on what our options were." (Doc. 68-9, p. 14). Additionally, the defendants do not dispute that other decision-makers had knowledge of the harassment and Mr. Moore's complaints about the harassment. (*See* 68-3, pp. 23-24; Doc. 68-9, p. 57). Thus, viewing the evidence in the light most favorable to Mr. Moore, Mr. Lillie's lack of knowledge about Mr. Moore's protected activity does not show that Mr. Moore cannot establish causation as a matter of law.

retaliatory acts linking his protected activity and the adverse employment action. (Doc. 69, pp. 32-35). A plaintiff may prove a causal connection when he can show that a "series of adverse employment actions commenced almost immediately after" his protected activity. *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir.1998). Here, Mr. Moore points to the following actions to prove a causal connection between his protected activity and the adverse employment action:

(1) in November 2013, Mr. Moore and his wife complained to Mr. Frantz and Mr. Ferrer about the customer's harassment of Mr. Moore, and Mrs. Moore asked for permission to confront the customer;

(2) in December 2013, Ms. Moore confronted the customer about the harassment, and Mr. Moore informed Mr. Frantz that she had done so;

(3) in late November or early December 2013, Mr. Ferrer and Mr. Frantz selected the candidate to fill a vacant operations manager position for the Huntsville branch without consulting Mr. Moore, despite the fact that Mr. Moore was in charge of hiring for the branch;[17]

(4) Mr. Frantz's and Mr. Ferrer's communications with Mr. Moore slowed or stopped in late 2013 and early 2014, and the managers began communicating directly with Mr. Moore's employees;

(5) in March 2014, Mr. Ferrer again selected a candidate to fill a vacant position in the Huntsville branch;

---

[17] The defendants argue that Mr. Moore was involved in the decision to hire Mr. Thrash because he interviewed Mr. Thrash and drove him to the airport. (Doc. 61-1, p. 29; Doc. 72, p. 6). But POOLCORP's corporate representative testified that Mr. Ferrer and Mr. Frantz made the decision to hire Thrash. (Doc. 68-2, p. 16). Thus, the defendants' argument is not persuasive.

(6) on May 22, 2014, Mr. Ferrer sent an email to POOLCORP's Senior Director of Human Resources, documenting complaints about Mr. Moore from four POOLCORP customers, including the customer who harassed Mr. Moore, but Mr. Ferrer did not discuss the complaints with Mr. Moore, and Mr. Ferrer omitted from the report the fact that the customer repeatedly called Mr. Moore a "nigger" and directed other racial epithets toward Mr. Moore. (Doc. 71-5, pp. 2-3);

(7) on June 5, 2014, Mr. Moore and Mr. Ferrer met with Mr. Moore and, according to Mr. Moore, tried to coerce him to resign;

(8) on August 12, 2014, Mr. Thrash sent Mr. Ferrer cycle counts showing missing inventory, and he accused Mr. Moore of theft;[18]

(9) and, on September 3, 2014 POOLCORP terminated Mr. Moore's employment.

(Doc. 69, pp. 10-14, 33-35; *see also* Doc. 68-4, pp. 70-71; Doc. 68-9, pp. 82-83; Doc. 68-12, ¶¶ 1-2; Doc. 68-19, p. 10; Doc. 68-21, pp. 50-51, 53; Doc. 71, pp. 4-7, ¶¶ 6, 8-10, 15; Doc. 71-5; Doc. 71-9; Doc. 71-10).

The defendants assert that the retaliatory acts that Mr. Moore identifies to prove a causal connection "do not constitute legally actionable 'retaliatory acts'. . . ." (Doc. 72, p. 6), but the defendants cite no authority for the proposition that the acts linking a plaintiff's protected activity to an adverse employment action must be legally actionable adverse employment actions themselves, and the Court has found no such authority. In *Wideman*, the Eleventh Circuit held that a jury must decide whether the plaintiff established the causal connection element of her prima facie retaliation case where the plaintiff demonstrated that the day after

---

[18] POOLCORP verifies inventory at a branch by counting inventory on a regular basis. POOLCORP refers to the technique as "cycle counting." (Doc. 68-9, p. 31).

she notified her supervisors that she filed an EEOC charge, her employer embarked upon a series of retaliatory acts. 141 F.3d at 1454-55, & 1457. The Eleventh Circuit stated that it did not have to decide if the individual retaliatory acts rose to the level of adverse employment actions because the acts considered collectively were sufficient to constitute an adverse employment action. *Id.* at 1456.

Interpreting the causal connection element broadly and viewing the evidence in the light most favorable to Mr. Moore, the Court finds that Mr. Moore produced sufficient evidence to raise a question of material fact regarding causal connection.

### 3. The Defendants' Proffered Reasons

The defendants' burden to articulate a legitimate non-discriminatory reason for firing Mr. Moore is "merely one of production;" the defendants do not have to prove they were "actually motivated by the proffered reasons." *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*). "[T]he proffered reason need only be 'one that might motivate a reasonable employer.'" *Id.* (citation omitted).

The defendants state that they fired Mr. Moore because POOLCORP received complaints from customers, and Mr. Moore mistreated employees and generally performed poorly at work. (Doc. 61-1, pp. 17-23, 31; *see also* Doc. 71-10, p. 2). The defendants' proffered reasons could motivate a reasonable employer to fire an employee, and the Eleventh Circuit has recognized similar reasons as

legitimate, non-discriminatory grounds for the termination of employees. *See Brown v. Pulaski Cty. Bd. of Educ.*, 263 Fed. Appx. 842, 843 (11th Cir. 2008); *Ivey v. Paulson*, 222 Fed. Appx. 815, 818 (11th Cir. 2007); *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997). Accordingly, the defendants satisfied their burden to produce a legitimate non-discriminatory reason for Mr. Moore's termination.

      4.   <u>Pretext</u>

Mr. Moore can establish pretext "directly, by persuading the court that a discriminatory reason more likely than not motivated the employer, or indirectly, by showing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Paschal v. United Parcel Serv.*, 573 Fed. Appx. 823, 825 (11th Cir. 2014) (quoting *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010)). "If a plaintiff 'presents circumstantial evidence that creates a triable issue of fact concerning the employer's discriminatory intent,' []he 'will always survive summary judgment.'" *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012) (quoting *Smith v. Lockheed-Martin*, 644 F.3d 1321, 1328 (11th Cir. 2011)). However, a plaintiff cannot avoid summary judgment simply by "quarreling with the wisdom of [the employer's proffered] reason[s]." *Chapman*, 229 F.3d at 1030 (citation omitted).

The Eleventh Circuit has cautioned that when analyzing pretext, a district court "must be careful not to allow [] plaintiffs simply to litigate whether they are, in fact, good employees." *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002). Courts "'are not in the business of adjudging whether employment decisions are prudent or fair. Instead, [the] sole concern is whether unlawful discriminatory [or retaliatory] animus motivates a challenged employment decision.'" *Id.* (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999)). To avoid summary judgment, Mr. Moore must rebut the defendants' proffered reasons for his termination with evidence that will allow jurors to conclude that the defendants' stated reasons for firing him are pretext for retaliatory motives. *Chapman*, 229 F.3d at 1037 (citation omitted).

a)    *customer complaints*

According to the defendants, the Huntsville branch received more customer complaints than usual in 2014, and the number of complaints from POOLCORP customers was one reason for Mr. Moore's termination. (Doc. 61-1, pp. 17-19; *see also* Doc. 68-3, pp. 66-67, 103-04; Doc. 68-9, pp. 16-17; Doc. 71-10, p. 2). In their brief in support of their motion for summary judgment, the defendants point to complaints from the following customers as a reason for firing Mr. Moore: (1) Pool Depot and Construction, (2) Voyles Construction, (3) Crystal Clear Pools, (4) Burks Company, (5) Professional Pools, (6) Valley Pools, (7) Russellville Pools,

and (8) Pools Plus. (Doc. 61-1, pp. 17-18). Mr. Moore contends that the complaints that POOLCORP identified concern long-standing issues that provoked no employment action before his termination or were issues for which he was not responsible.

### i) Pool Depot and Construction

The owner of Pool Depot and Construction complained to Mr. Ferrer and Mr. Lillie about Mr. Moore's attitude towards customers. (Doc. 60-22, pp. 8, 22-23, 33; *see also* Doc. 61-1, p. 17). Pool Depot refused to do business with POOLCORP while Mr. Moore was there. (Doc. 60-22, pp. 34-35, 39).[19] Mr. Harwell, the owner of Pool Depot, testified that Mr. Moore would sell products to him and then take "kickback money," but Mr. Frantz acknowledged that there is no evidence of kickbacks or proof that Mr. Moore did anything dishonest. (Doc. 60-22, pp. 26-29; Doc. 68-3, p. 94). For his part, Mr. Moore denies receiving kickback money from Mr. Harwell, but Mr. Moore acknowledges that Mr. Harwell complained about him to managers at POOLCORP and stopped doing business with the company. (*See* Doc. 69).

### ii) Voyles Construction

Ray Voyles, the owner of Voyles Construction, sent a text message to Mr. Moore and Mr. Works in which he (Mr. Voyles) complained that Voyles

---

[19] Pool Depot began buying products from POOLCORP again after POOLCORP fired Mr. Moore. (Doc. 60-22, p. 39).

Construction did not "obtain[] correct product at the time of delivery," and Mr. Voyles threatened to stop doing business with POOLCORP. (Doc. 68-4, p. 120; Doc. 68-17, pp. 1-2; *see also* Doc. 61-1, p. 17). Mr. Works shared the text message with Mr. Ferrer, who then reported the issue to POOLCORP's Senior Director of Human Resources. (Doc. 63-1, pp. 3-4, ¶¶ 5-7, 11; Doc. 71, p. 10, ¶ 27). After he received the text from Mr. Voyles, Mr. Moore went to see Mr. Voyles and "worked with [him] for several days to make things right." (Doc. 68-17, p. 1). Mr. Moore does not dispute that Mr. Voyles made the complaint, but Mr. Moore asserts that he informed Mr. Ferrer about the text and told him that he handled the problems before Mr. Works shared the text with Mr. Ferrer. (Doc. 71, p. 10, ¶ 27).

### iii)    Crystal Clear Pools

In May 2014 Mallory Hambrick, an employee of Crystal Clear Pools, complained to Mr. Ferrer about slow deliveries and inconsistent pricing from the Huntsville branch and about Mr. Moore not treating her with respect. (Doc. 60-16, ¶¶ 2, 6, 9; Doc. 68-4, p. 235; Doc. 68-9, pp. 49-50; Doc. 71-5, p. 3). Mr. Ferrer discussed Ms. Hambrick's complaints in an email to POOLCORP's Senior Director for Human Resources. (Doc. 71-5). Mr. Ferrer did not talk to the owner of Crystal Clear Pools about Ms. Hambrick's complaints, and he did not discuss

the complaints with Mr. Moore before alerting POOLCORP's HR department about the complaints. (Doc. 68-9, pp. 50-51; Doc. 71-5, p. 3).

Mr. Moore does not dispute that Ms. Hambrick complained to Mr. Ferrer about him not treating her with respect, but he asserts he did not know about the other issues because Mr. Works and Mr. Thrash handled most of the contact with Crystal Clear Pools. (Doc. 68-4, p. 235; Doc. 71, p. 8, ¶ 18). Although Ms. Hambrick complained to Mr. Ferrer about slow deliveries and inconsistent pricing, Sean Swatek, the owner of Crystal Clear Pools, attests that the problems identified "were no different than the usual problems in th[e] business" and "no more or no less than they had been in previous years." (Doc. 68-10, p. 2).

iv)    Burks Company

In 2013, the Burks Company complained to POOLCORP about differences in prices between the Huntsville and Birmingham branches, and the company threatened to stop doing business with POOLCORP due to the pricing differentials. (Doc. 68-4, pp. 85-87). Mr. Moore does not dispute that Burks Company complained, but asserts that the company's complaints were directed to the Birmingham branch, rather than the Huntsville branch, because the Birmingham branch was overcharging. (Doc. 69, p. 22; Doc. 68-4, pp. 85-86). Mr. Moore also asserts that the pricing differentials were created by Mr. Works's failure to "matrix" prices. (Doc. 69, p. 22; *see also* Doc. 71, p. 11, ¶ 29).

### v) Professional Pools

The owner of Professional Pools complained to Mr. Works about Mr. Moore cursing or using the Lord's name in vain during a visit to her store, though she attests that she never complained to POOLCORP management about what he said. (Doc. 60-20; Doc. 68-4, p. 119-20; Doc. 68-11, p 1; Doc. 71-5, pp. 2-3). Mr. Moore apologized to Ms. Price "on the spot" for cursing in her store. (Doc. 68-4, p. 121). Additionally, Mr. Moore contends that the owner, Ms. Price, also complained that Mr. Works provided his father's business with better pricing and preferential treatment. (Doc. 68-11, p. 1; Doc. 71, p. 8, ¶ 19). Ms. Price complained to Dominic Medici, a corporate sales manager for POOLCORP, about her belief that Mr. Works's father was receiving preferential pricing, but it is unclear whether Mr. Medici shared that information with Mr. Ferrer or Mr. Frantz. (Doc. 68-11, p. 2; Doc. 68-9, p. 49). Ms. Price also complained to Mr. Medici about her belief that Mr. Moore lied to her about trying to call her to schedule a pick up, and Mr. Medici quickly informed Mr. Ferrer of that complaint. (Doc. 63-1, pp. 7-8, 57).

### vi) Valley Pools

Ronnie Hughes, the owner of Valley Pools, complained to Mr. Ferrer and Mr. Frantz about Mr. Moore selling products to unlicensed contractors and homeowners. (Doc. 60-15, pp. 1-2; Doc. 68-16, p. 1). Mr. Hughes told Mr. Ferrer

and Mr. Frantz that he "would have done more business with Superior if [he] had not had to compete against [Mr. Moore]." (Doc. 60-15, p. 2). He stopped doing business with POOLCORP in 2013, but that was due to pricing rather than to any issues regarding Mr. Moore or sales to unlicensed contractors. (Doc. 68-4, pp. 148-51; Doc. 68-16, p. 2). In fact, Mr. Hughes attests that he "enjoyed doing business with [Mr.] Moore" and he "believe[s] that [Mr. Moore] was a good manager, and [he] ha[s] never had a problem with [Mr. Moore's] service or the products he sold." (Doc. 68-16, p. 1). Mr. Moore does not dispute that Mr. Hughes complained about him selling product to unlicensed contractors, but asserts that Mr. Frantz and Mr. Ferrer knew that he (Mr. Moore) was doing business with unlicensed contractors before Mr. Hughes complained about the issue. (Doc. 71, p. 9, ¶ 23). Additionally, Mr. Moore attests that he discussed the issue with his supervisors, but they would not indicate if they wanted the Huntsville branch to stop selling to unlicensed contractors. (Doc. 71, p. 9, ¶ 23).

### vii) Russellville Pools

Stanley Hall, the owner of Russellville Pools and the customer who harassed Mr. Moore, complained to Mr. Ferrer in May 2014 about an untimely delivery of a pool kit. (Doc. 61-1, p. 18; Doc. 68-9, p. 55). Mr. Ferrer informed POOLCORP's Senior Director of HR of Mr. Hall's complaint and noted that the customer felt that Mr. Moore was trying to inconvenience him "due to some issues [they] had in the

past." (Doc. 71-5, p. 2). But Mr. Ferrer did not mention the harassing conduct or explain the nature of the issues between Mr. Hall and Mr. Moore, even though POOLCORP's Unlawful Harassment Policy requires employees who become aware of an incident of harassment to report it. (Doc. 68-1, p. 10; Doc. 71-5, p. 2). In addition, although Mr. Ferrer told HR that Mr. Moore did not have an explanation for the issue with the pool kit delivery, Mr. Moore attests that he told Mr. Ferrer about the issue when it happened and explained that the pool kit was not delivered on a timely basis "because it was never placed on the 'chalkboard' for delivery by [Mr.] Works." (Doc. 71, p. 10, ¶ 25; Doc. 71-5, p. 2).

viii)   Pools Plus

Finally, the owner of Pools Plus complained to Mr. Ferrer about inconsistent pricing in 2013 and 2014. (Doc. 68-9, pp. 18-19). Though the exact nature of the complaint is not clear from the record, Mr. Moore asserts that the Huntsville Branch's problems with pricing related to Mr. Works's failure to "matrix" prices and POOLCORP's failure to train Mr. Works. (Doc. 71, p. 11, ¶ 29).

In sum, while Mr. Moore does not deny many of the complaints that the defendants cite as reasons for his termination, he argues that the complaints were normal in the pool business and "simply a pattern of previous conduct between Superior and its customers." (Doc. 69, p. 36; *see also* Doc. 68-10, p. 2). Mr. Moore also presented evidence that he had addressed several of the complaints at

the time the customers complained and also that some of the complaints that the defendants cite as reasons for his termination were directed to other employees or POOLCORP branches rather than to Mr. Moore and his management of the Huntsville branch. (*See* Doc. 68-4, pp. 85-86, 121; Doc. 68-16, pp. 1-2; Doc. 68-17, p. 11; Doc. 71, pp. 10-11, ¶¶ 25, 29). Taken in the light most favorable to Mr. Moore, a jury must resolve the disputed issues regarding customer complaints.

b) *mistreatment of employees*

The defendants contend that Mr. Moore mistreated employees at the Huntsville branch, causing several of them to leave or seek other employment. (Doc. 61-1, pp. 19-20). Specifically, the defendants point to complaints from Gordon Mathewson, James Newcomb, David Webb, Philip Works, and Michael Thrash and to issues pre-dating 2009 as legitimate, non-discriminatory reasons for Mr. Moore's termination. (Doc. 61-1, pp. 19-20).

Several of the employee complaints that the defendants identify as reasons for terminating Mr. Moore occurred more than five years before POOLCORP decided to terminate his employment. (*See* Doc. 61-1, pp. 19-20). For example, the defendants rely upon a January 2005 letter from Tig Blake to Mr. Moore counseling him for his "style in dealing with employees in certain situations" and outlining steps to be taken to address the issue. (Doc. 61-1, pp. 19-20; Doc. 60-24). The letter noted that if Mr. Moore "cannot or will not change the [employee

complaint] issues, it could lead to a change of job status or termination of [his] employment." (Doc. 60-24, p. 2).[20]  In addition, the defendants point to a 2004 complaint from an employee who claimed that Mr. Moore threatened him with a gun, a claim which Mr. Moore disputes. (Doc. 61-1, p. 19; Doc. 68-4, p. 168). The defendants also cite a 2009 complaint from an employee who accused Mr. Moore of sexual harassment. (Doc. 61-1, p. 20; Doc. 60-26).  Mr. Moore denies the employee's accusations but does not deny that the employee made the accusations or that HR addressed the accusations in a January 2009 email to him. (Doc. 60-26; Doc. 71, p. 10, ¶ 26).

Because the 2009 complaint and the 2004 and 2005 employee complaints occurred more than five years before Mr. Moore's termination, a jury could find that those issues are not the defendants' true reason for terminating Mr. Moore but are instead pretext for a retaliatory purpose.

The defendants' reliance on complaints from James Newcomb and David Webb is equally unpersuasive because neither Mr. Newcomb nor Mr. Webb formally complained to Mr. Ferrer or Mr. Frantz about the way Mr. Moore treated them. (Doc. 68-20, pp. 10-11; Doc. 60-31, pp. 19-22, 29-31, 37).  Additionally, Mr. Webb only told Mr. Works that he was thinking of leaving POOLCORP, and there is no evidence that Mr. Webb identified Mr. Moore as a reason that he was

---

[20] The January 2005 letter also stated that Mr. Moore's "passion for taking care of customers and [his] drive to succeed are what we need and what we expect." (Doc. 60-24, p. 1).

considering other employment. (*See* Doc. 68-20, pp. 12-13). Because the record suggests that neither Mr. Newcomb nor Mr. Webb complained to Mr. Moore's supervisors about the way he treated them, a reasonable jury could find that the complaints were not the true reason for Mr. Moore's termination but were pretext for the defendants' retaliatory purposes.

The defendants contend that Mr. Mathewson considered leaving POOLCORP because of Mr. Moore and point that as a reason for firing Mr. Moore. (Doc. 61-1, p. 19). Mr. Mathewson complained about Mr. Moore in 2014 and informed Mr. Ferrer that he was considering finding another job because of the way Mr. Moore treated him. (Doc. 68-9, p. 26; Doc. 68-19, pp. 12-13; Doc. 71-6, p. 2). According to Mr. Mathewson, Mr. Ferrer responded to his complaint about Mr. Moore by saying "they were looking into it and [] to hold off a little bit and wait it out and see what happens." (Doc. 68-19, p. 14).[21] Mr. Ferrer did not inform Mr. Moore of Mr. Mathewson's complaints. (Doc. 69, p. 24). Viewing the evidence in the light most favorable to Mr. Moore, a jury could infer from Mr. Ferrer's statement in response to Mr. Mathewson's complaint and his failure to inform Mr. Moore about the complaint that POOLCORP decided to fire Mr. Moore before Mr. Mathewson made his complaint.

---

[21] "'[A] district court may consider a hearsay statement in passing on a motion of summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form.'" *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)).

The defendants assert that Mr. Thrash, the operations manager for the Huntsville branch, quit his job because of Mr. Moore and point to that fact as another reason for firing Mr. Moore. (Doc. 61-1, p. 19). The defendants' assertion rings hollow because Mr. Thrash did not quit working at the Huntsville branch until November 2014, several months after POOLCORP terminated Mr. Moore. (*See* Doc. 61-1, p. 19; Doc. 68-21, pp. 91-93, 108-09, 113-14).[22] Thus, Mr. Thrash's departure from POOLCORP could not have been a reason for the defendants' decision to terminate Mr. Moore's employment.

The defendants also assert that Mr. Works, the business development manager for the Huntsville branch, complained about Mr. Moore and quit his job in June 2014 because of Mr. Moore. (Doc. 61-1, p. 19). In May 2014, Mr. Works told Mr. Ferrer that he was leaving his job because he did not like the environment at the Huntsville branch due to customer complaints and employee morale. (Doc. 68-5, pp. 65, 67-68). Mr. Works testified that he attributed those problems to Mr. Moore. (*See* Doc. 68-5, pp. 82-83). According to Mr. Ferrer, Mr. Works told him that he was leaving POOLCORP in part because of Mr. Moore's management. (Doc. 71-6, p. 3). Mr. Works met with Mr. Lillie, the future regional manager of the Huntsville branch, in August 2014 and, according to Mr. Lillie, Mr. Works told him that he (Mr. Works) left POOLCORP because he was unhappy with the work

---

[22] At the time he resigned, Mr. Thrash told POOLCORP that the reason for his resignation was that he was "[m]oving on to a better opportunity." (Doc. 68-21, p. 139).

environment at the Huntsville branch and did not like working with Mr. Moore. (Doc. 68-23, p. 71). Mr. Moore does not dispute that Mr. Works complained about him and admits that the defendants "blamed [Mr.] Works' resignation on [him]." (Doc. 69, p. 23). However, Mr. Works did not testify that he told Mr. Lillie or Mr. Ferrer that he left POOLCORP because of Mr. Moore. (*See* Doc. 68-5).

c) *performance issues*

The defendants also contend that they terminated Mr. Moore for his poor performance. (Doc. 61-1, pp. 20-21). To support that contention, they point to a January 2009 disciplinary write-up Mr. Moore received following an internal audit. (Doc. 61-1, p. 20; Doc. 60-25). Mr. Franz and Mr. Ferrer counseled Mr. Moore regarding the issues identified in the write-up, related to cash management, invoicing, open orders, wholesale sales guidelines, operations, and human resources. (Doc. 60-25, p. 1). After Mr. Moore received the write-up, POOLCORP's human resources sent Mr. Moore a memo dated January 15, 2009 and stating in part:

> Because of your long standing employment with the company you are being given the opportunity to correct the serious short coming regarding managing branch assets, including cash, operations, and employees. You were told that lack of immediate and permanent change would result in your dismissal.

(Doc. 60-26, p. 1). According to the defendants, Mr. Moore's performance did not improve, and Mr. Ferrer received complaints that Mr. Moore did not properly use

POOLCORP's price matrix management. (Doc. 61-1, p. 21; Doc. 60-3, p. 93).[23] In April 2014, Mr. Ferrer sent an email to Mr. Moore and Mr. Works regarding problems caused by the Huntsville branch's failure to properly matrix prices and by price overrides. (Doc. 63-4, pp. 2-3). Mr. Moore admits receiving the email and does not dispute that the Huntsville branch had problems with price overrides and price matrix management, but he asserts that the problems were caused by POOLCORP's failure to train Mr. Works to use the price matrix management system. (*See* Doc. 69, p. 22). POOLCORP's pricing manager admitted that POOLCORP was "remiss in getting [Mr. Works] training . . . ." (Doc. 71, p. 12).

The defendants assert that the Huntsville branch had a problem with missing inventory and that they fired Mr. Moore, at least in part, because of that issue. (Doc. 61-1, pp. 21-22). When Mr. Thrash began working at the Huntsville branch in February 2014, one of his responsibilities was cycle counts of the branch's inventory. (Doc. 60-10, pp. 13, 46-47). The cycle counts showed the branch had missing inventory, and Mr. Thrash sent the cycle counts to Mr. Ferrer in August 2014. (Doc. 60-10, p.; Doc. 68-9, p. 84). Although Mr. Thrash suspected that Mr. Moore was stealing products, Mr. Ferrer testified that Mr. Thrash did not accuse Mr. Moore of theft or inform him (Mr. Ferrer) of his suspicions. (Doc. 60-10, pp. 50-51; Doc. 68-9, p. 85). Mr. Moore admits that the Huntsville branch had a

---

[23] It is unclear from the record when Mr. Ferrer received those complaints. (*See* Doc. 60-3, p. 93).

problem with missing inventory, but attests that the branch "always had some amount of 'shrinkage' or missing parts or equipment" and that "[i]n 2014, the shrinkage level was no different than it had been in previous years." (Doc. 71, p. 6, ¶ 12).

Finally, the defendants assert that Mr. Moore violated POOLCORP policy by accepting a gift from a customer. (Doc. 61-1, pp. 22-23). In particular, the defendants contend that Mr. Moore accepted four tickets to the circus from Mr. Harwell in exchange for helping Mr. Harwell measure a pool liner. (Doc. 60-22, pp. 49-50; Doc. 60-23). Mr. Moore testified that he and Mr. Harwell and their families were friends, that his (Mr. Moore's) son called Mr. Harwell "Uncle Ken," and that Mr. Harwell gave the tickets to his children as a gift. (Doc. 60-1, pp. 48-49). Moreover, POOLCORP management did not discuss Mr. Moore's alleged violation as a reason for Mr. Moore's termination during the meeting in which they made the decision to fire him. (*See* Doc. 68-9, p. 16). Thus, a jury could reasonably find that the alleged policy violation was not one of the reasons for POOLCORP to fire Mr. Moore, but is pretext for its retaliatory intent.

As discussed above, the defendants proffer a litany of customer complaints, employee complaints, and performance issues as reasons to fire Mr. Moore. (*See* Doc. 61-1, pp. 17-23). Several of the issues the defendants cite as legitimate reasons for firing Mr. Moore date back to 2005 and 2009—five or more years

before Mr. Moore's termination. A factfinder could reasonably infer that the defendants had simply had enough of Mr. Moore's alleged issues and decided to fire Mr. Moore based on those issues. However, a factfinder could also infer that the defendants' proffered reasons for firing Mr. Moore are pretextual because the defendants did not view customer and employee complaints about Mr. Moore or Mr. Moore's performance issues as fireable offenses until after Mr. Moore's wife confronted a POOLCORP customer about his harassing behavior. The Court cannot make that determination at summary judgement; instead, a jury must decide the issue. *E.g., United States v. Stein*, 881 F.3d 853, 858 (11th Cir. 2018).

Viewing the evidence in the light most favorable to Mr. Moore, as the Court must, Mr. Moore created a disputed question of material fact regarding the defendants' alleged retaliatory intent. Thus, the Court denies defendants' motion for summary judgment on Mr. Moore's retaliation claim.

## IV. CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** and **DENIES IN PART** the defendants' motion for summary judgment. (Doc. 61). The defendants are entitled to summary judgment on Mr. Moore's § 1981 discrimination claims. The defendants' motion is **DENIED** with respect to Mr. Moore's § 1981 racial harassment and retaliation claims. By separate order, the Court will set those claims for trial. Additionally, the Court **DENIES** Mr. Moore's

motion for leave to file a sur-reply brief and to amend his amended complaint (doc. 73).

      **DONE** and **ORDERED** this March 30, 2018.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE